UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 28, 2017

------------------------------------------------------------------X
                :

JACQUELINE HAYES,             :
                :
              Plaintiff,    :       16-cv-5259 (KBF)
                :
        -v-         :      OPINION & ORDER
                :
NANCY A. BERRYHILL, Acting Commissioner of :
Social Security,            :
                :
           Defendant.   :
                :
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Plaintiff Jacqueline Hayes seeks review of the decision by defendant Commissioner of Social Security (the "Commissioner"), finding that she was not disabled and not entitled to Social Security Disability ("SSD") benefits under Title II of the Social Security Act (the "Act"). Plaintiff filed for disability benefits based on injuries to her lower back, left knee, and right wrist.

Now before the Court are the parties' cross-motions for judgment on the pleadings. For the reasons set forth below, defendant's motion is GRANTED and plaintiff's motion is DENIED.

I.    PROCEDURAL AND FACTUAL BACKGROUND

    A.    <u>Procedural Background</u>

Plaintiff applied for SSD benefits on August 29, 2012. (Tr. 143.)[1] The Social Security Administration ("SSA") denied her claims. (Tr. 166-169.) Plaintiff then

---

[1] "Tr." refers to the pages of the administrative record filed by the Commissioner as part of her answer.

requested a hearing before an administrative law judge ("ALJ"), which was held on April 10, 2014. (Tr. 68-140.) On June 23, 2014, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 147-156.) On October 27, 2014, the Appeals Council vacated the ALJ's decision and remanded the case for another hearing. (Tr. 161-65). The plaintiff and her attorney appeared for a second hearing before the ALJ on April 7, 2015. (Tr. 44-67.) On June 22, 2015 the ALJ issued a second decision, again finding that plaintiff was not disabled. (Tr. 25-37.)

The ALJ's 2015 decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on March 3, 2016. (Tr. 5-11.)

B.    Factual Background

The Court recites only those facts relevant to its review. A more thorough summary of plaintiff's medical history can be found in the parties' briefing and in the extensive administrative record.

1.    Plaintiff's Personal History

Plaintiff was born in October 1966. (Tr. 443.) She graduated from high school and subsequently worked at the post office, as a press operator for IBM, as a caregiver, and as a hand-packer for a party supply company. (Tr. 51-53, 442.) She stopped working as a hand-packer in June 2007, after she fell at work. (Tr. 86, 392.)

2. <u>Plaintiff's Medical History</u>

    a. Records During the Relevant Period (June 12, 2007 through March 31, 2012)[2]

Plaintiff began treatment with Dr. Harvey Siegel, an orthopedist, on July 3, 2007, two weeks after she fell at work. (Tr. 788-89.) She saw Dr. Siegel regularly from 2007 through 2009. (Tr. 775-789.) She initially sought treatment only for her right wrist and left knee, and did not mention any injury to her back. (Tr. 788.) X-rays and straight leg raising ("SLR")[3] were negative. (<u>Id.</u>) Dr. Siegel diagnosed contusion of the knee and wrist, and told plaintiff to begin weight bearing to tolerance and to stay out of work. (Tr. 789.)

Plaintiff returned to Dr. Siegel two weeks later, on July 16, 2007. (Tr. 787.) She reported that shortly after her fall she had felt some brief back pain, but that more recently she had begun to feel a sharp pain in her lower back. (<u>Id.</u>) Upon examination, Dr. Siegel observed significantly diminished range of motion of the back. (<u>Id.</u>) SLR was negative and plaintiff was neurovascularly intact. (<u>Id.</u>) Dr. Siegel stated that plaintiff could not return to work, and recommended physical therapy for her back, wrist, and knee. (<u>Id.</u>)

In connection with her worker's compensation case, plaintiff underwent an orthopedic Independent Medical Examination ("IME") performed by Dr. Lawrence Foster on October 4, 2007. (Tr. 589-98.) Dr. Foster observed that SLR was

---

[2] An individual's "last date insured" establishes the period of coverage during which an individual must prove they became disabled. Here, it is not in question that plaintiff's last date insured was March 31, 2012. Accordingly the "relevant" period for this case is June 12, 2007, the date plaintiff was injured, to March 31, 2012, the plaintiff's last insured date.

[3] The SLR is a test done to determine whether a patient with low back pain has an underlying herniated disk.

negative and motor strength was intact; he further observed that plaintiff's left knee had reduced range of motion but no instability, and that plaintiff's right wrist had intact sensation and negative Tinel's sign.[4]  (Tr. 593.)  He diagnosed right wrist sprain, post-traumatic right wrist ganglion, and possible left knee derangement, all causally related to plaintiff's accident.  (Tr. 595.)  He could not determine a causal relationship between the plaintiff's back injury and the accident, as Dr. Siegel's initial report made no mention of back injury.  (Tr. 596.)  In an addendum to his report, written on November 15, 2007, Dr. Foster added that plaintiff could engage in light/sedentary work that would allow standing and sitting as needed and would not require bending, carrying, or lifting.  (Tr. 587.)

Plaintiff returned to Dr. Foster for a second IME on January 31, 2008.  (Tr. 580.)  Dr. Foster observed that plaintiff had extremely limited range of motion of the spine, that she moved slowly and deliberately, and had difficulty getting on and off of the examination table.  (Tr. 582.)  He further noted reduced motion in her left knee, an antalgic gait (a limp adopted to avoid pain), and a partial moderate-to-marked disability.  He also mentioned that she exhibited signs of symptom magnification.  (Tr. 585.)  Based upon a report from Dr. Siegel, Dr. Foster added the lower back to the list of injuries causally related to plaintiff's fall.  (Tr. 584.)  He reiterated that plaintiff should be restricted to light/sedentary work.  (Tr. 586.)  Thus, as of the end of January 2008, Dr. Foster had twice indicated that plaintiff was capable of light/sedentary work.

---

[4] Tinel's sign is a way to detect irritated nerves.

On April 4, 2008, plaintiff returned to Dr. Siegel. He recommended physical therapy and magnetic resonance imagings ("MRI's"). (Tr. 781.) He did not reiterate his prior recommendation that plaintiff not return to work. (Id.)

Plaintiff returned to Dr. Siegel on May 19, 2008, complaining of pain in both knees and in her lower back. (Tr. 780.) Dr. Siegel observed full range of motion of the knees, no effusion,[5] strong quads, negative SLR, negative patellofemoral grind[6] and negative stresses. (Id.) He recommended continued exercise and physical therapy and stated that he was awaiting permission for an MRI. (Id.)

On June 30, 2008, Dr. Siegel observed a positive patellofemoral grind, a full range of motion, no effusion, and strong peroneals. (Tr. 778.) He prescribed Vicodin for pain. (Id.)

On September 30, 2008, plaintiff returned to Dr. Siegel, whereupon he observed equivocal SLR, decreased range of motion in her back, tenderness at the patella, and no effusion. (Tr. 777.) He noted that she remained unable to do her normal work. (Id.) He advised her to seek the help of an attorney to obtain her recommended MRIs. (Id.)

On April 14, 2009, plaintiff underwent a third IME, performed by Dr. Arnold Goran. (Tr. 574.) Dr. Goran observed that plaintiff had limited range of motion of the spine, was unable to walk on her heels and toes, and displayed a markedly antalgic gait. (Tr. 577.) Dr. Goran further reviewed an MRI of the lumbar spine,

---

[5] Effusion denotes an excess of liquid around the kneecap.
[6] Patellofemoral grind tests for joint disorder of the knee.

and found no significant disc herniation, no significant facet arthropathy,[7] and that it was "not impressive" from a surgical point of view. (Tr. 576.) He diagnosed plaintiff with acute and chronic lower back pain with right lower extremity radiculitis causally related to her accident. (Tr. 578.) Dr. Goran's conclusion was similar to Dr. Foster's—that she could not return to her usual work, but that she was capable of light duty employment with restrictions. (Id.) He based these restrictions on plaintiff's self-report, concluding that she could walk for 15 minutes, sit without change in position for 15 minutes, stand without change in position for 15 minutes, and lift under 10 pounds. (Tr. 576.)

Plaintiff saw Dr. Syed Iqbal Hosain, a pain management specialist, on May 13, 2009. (Tr. 728.) On examination, Dr. Hosain observed that muscle tone was normal, sensation was intact, reflexes were equal, muscle bulk was preserved, SLR was negative, and gait was normal. (Tr. 729.) He noted that plaintiff had reduced motion of the spine. (Id.) Dr. Hosain recommended a lumbar facet injection (Id.); he administered the injection on June 11, 2009. (Tr. 495.) Upon her return on September 30, 2009, she complained of renewed tenderness across the lumbar spine. (Tr. 554.) Dr. Hosain observed a normal gait, no muscle spasm, and negative SLR. (Id.) He recommended a second facet injection. (Id.)

On October 16, 2009, plaintiff saw a surgeon, Dr. John McLaughlin, for an evaluation of her left knee. (Tr. 739.) Dr. McLaughlin noted that the X-ray revealed a lateral meniscus tear and scheduled her for left-knee surgery. (Id.) He

---

[7] Facet arthropathy denotes arthritis in the facet joints of the spine; when present, it causes lower back pain.

performed the surgery on December 1, 2009.  (Tr. 791.)  In follow-up visits, Dr. McLaughlin noted that plaintiff could perform straight leg raising and was neurovascularly intact.  (Tr. 602-3, 766.)  He further noted that she had not participated in physical therapy in the post-operative period, although she had been instructed to do so.  (Tr. 768.)  He emphasized the importance of future physical therapy.  (Id.)

Plaintiff also sought care from her primary care physician, Dr. Ivette Torres, during the relevant period.  On November 4, 2009, Dr. Torres's examination revealed that she was pleasant and in no acute distress.  (Tr. 520.)  Her blood pressure was 143/102 and she weighed 257 pounds; Dr. Torres diagnosed her with hypertension and obesity.  (Id.)

Plaintiff returned to Dr. Torres on March 9, 2010, having lost five pounds since the November appointment through walking six times a week.  (Tr. 516.)  Dr. Torres noted that plaintiff's obesity was improving, and that her hypertension was adequately controlled.  (Tr. 518.)  Plaintiff denied weakness, myalgias (muscle pain), or numbness.  (Tr. 516.)

In plaintiff's following three visits to Dr. Torres, on December 21, 2010, September 14, 2011, and December 19, 2011, she continued to lose weight and reported continued daily exercise by walking.  (Tr. 502, 507, 510.)  Her total weight loss was 58.6 pounds.  (Tr. 502, 520.)  Throughout these visits she denied any myalgias or muscle weakness.  (Tr. 502, 507, 510.)

Plaintiff continued to see Dr. Hosain for back pain throughout 2010 and 2011. (Tr. 494, 535-546, 548, 553.) Throughout this period she complained of tenderness along the lumbar facet joints; however her gait was normal, her sensation was intact, she had full muscle strength, the SLR remained negative, and there was no muscle spasm. (Tr. 541, 543, 546, 548, 553, 563, 599.)

On January 17, 2012, plaintiff received another intra-articular facet injection from Dr. Hosain (Tr. 493) and reported significant improvement in her February 8, 2012 follow-up appointment. (Tr. 540.) The SLR was negative to 70 degrees, muscle strength was full, sensation was intact, gait was normal, and there was no muscle spasm. (Id.) Plaintiff complained of some residual lower back pain, and Dr. Hosain recommended non-steroidal anti-inflammatory medication, stretching exercises, and possible trigger injections. (Id.) She returned to Dr. Hosain on March 7, 2012, displaying a normal gait but now complaining of neck pain. (Tr. 682.)

b. Records after the Relevant Period (After March 31, 2012 Expiration of Insured Status)

On August 1, 2012, four months after the expiration of her insured status, plaintiff underwent a fourth IME, this time performed by Dr. Robert Mann. (Tr. 567.) Dr. Mann observed reduced motion of the lumbar spine, full motor strength, equal reflexes, intact sensation, normal gait, and no muscle atrophy. (Tr. 570.) Dr. Mann concluded that plaintiff had no work restriction in relation to her wrist, but that due to her left-knee injury, plaintiff should avoid prolonged standing, walking, kneeling, and squatting. (Tr. 571.) He recommended no further follow-up care,

including no physical therapy or injections, and encouraged her to follow up with her treating physician occasionally. (Tr. 572.) Dr. Mann amended his report on September 10, 2012, stating that plaintiff had a mild partial disability. (Tr. 564.) He stated that she could work as long as she avoided prolonged standing, walking, bending, twisting, and lifting greater than 30 pounds. (Tr. 565.)

Plaintiff returned to Dr. Hosain on August 9, 2012, complaining of tenderness along the lumbar and cervical facet joints. (Tr. 535.) Dr. Hosain observed full muscle strength, normal gait, no muscle spasm, and negative SLR to 70 degrees. (Id.) Dr. Hosain suggested lumbar radiofrequency treatment. (Id.)

In response to a request from plaintiff's former attorney, Dr. Hosain filled out a "Summary Impairment Questionnaire" on December 4, 2013. (Tr. 955.) In the form, he stated that plaintiff could stand for less than one hour per workday and sit for only one hour per workday. (Id.) He further opined that she could only occasionally lift up to ten pounds and that these limitations had existed since September 1, 2007. (Id.)

Dr. Hosain completed a second form, a "Physical Assessment for Determination of Employability," for the Orange County Department of Social Services on September 10, 2014, in which he reiterated these limitations, stating that plaintiff could occasionally lift up to ten pounds, and could stand or walk for less than two hours a day. (Tr. 958.) These limitations were consistent with less than sedentary work. (Id.)

Plaintiff returned to Dr. Hosain in September 14, 2014, having fallen and injured her right knee. (Tr. 973.) Dr. Hosain observed that plaintiff's knee was tender and her gait antalgic. (Id.) He advised a consultation with an orthopedist. (Id.) In her January 16, 2015 follow-up appointment with Dr. Hosain, plaintiff complained of increasing back pain. (Tr. 975.)

### 3. Consultative Opinions

On January 26, 2015, plaintiff was examined by Dr. Rita Figueroa, an orthopedist, at the request of the Commissioner. (Tr. 959-61.) Plaintiff reported chronic neck and back pain since 2007. (Tr. 959.) Plaintiff further stated that she cooked three times a week, shopped once per week, and cleaned once per week. (Tr. 960.) Dr. Figueroa observed that plaintiff walked with a limp, had reduced range of motion of spine and hips, absent reflexes, and declined to squat or walk on her heels. (Id.) She further observed that plaintiff had full motor strength, intact sensation, negative SLR, and no atrophy. (Tr. 961.) Dr. Figueroa opined that plaintiff had marked limitations for activities requiring prolonged walking, standing, repetitive bending, lifting, and carrying. (Tr. 962.) She found a moderate limitation to pushing and pulling. (Id.)

### 4. Expert Opinions

Josiah Pearson, a vocational expert ("VE"), provided expert testimony at the April 7, 2015 administrative hearing based on his review of the record. (Tr. 60-64.) The ALJ asked him to describe the jobs available to a hypothetical individual with plaintiff's vocational profile assuming the following restrictions: sitting for six out of

eight hours, with the ability to change positions for two minutes out of every 20, while not being off task during those minutes; lifting or carrying up to ten pounds; no climbing ropes, ladders, scaffolds, stairs, or ramps; occasional bending and stooping; no kneeling, crawling, or crouching. (Tr. 61-62.) In response to this description, the VE concluded that such an individual could perform sedentary work as a document preparer, addresser, and order clerk. (Tr. 62-63.) The VE testified that his conclusion was consistent with the information found in the Dictionary of Occupational Titles ("DOT"), but that he supplemented based on his own experience where the DOT was silent; in this case, the DOT did not provide the "moving changing positions." (Tr. 64.)

Plaintiff's attorney asked the VE whether a hypothetical person who could only sit for one hour a day, stand for less than one hour in a day, and lift less than ten pounds would have any jobs available. (Tr. 64.) The VE responded that he knew of no such jobs. (Tr. 64.)

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted). Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id.

(quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

    B.    The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she

demonstrates an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's

impairment must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."

Id. § 423(d)(2)(A). The disability must be "demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability

determinations. See 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has

described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not, the
> Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability to
> do basic work activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment that is listed in [Appendix 1]. If the
> claimant has a listed impairment, the Commissioner will consider the
> claimant disabled without considering vocational factors such as age,
> education, and work experience; the Commissioner presumes that a
> claimant who is afflicted with a listed impairment is unable to perform
> substantial gainful activity. Assuming the claimant does not have a
> listed impairment, the fourth inquiry is whether, despite the

> claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998). The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

      C.     Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final. See Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). If the Commissioner and ALJ's findings as to any fact are supported by substantial

evidence, then those findings are conclusive. 42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."). The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor." (citations omitted)). An ALJ's decision on credibility "must

contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

D.    The Treating Physician Rule

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess, 537 F.3d at 128. An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist." Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance." 20 C.F.R. § 416.927(d)(3); see also Soc. Sec.

Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133. It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence. See Richardson, 402 U.S. at 399.

E.    The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (citations and internal quotation marks omitted). SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Astrue, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).

III.    DISCUSSION

Plaintiff argues that the ALJ erred when he concluded that she was not disabled and was capable of performing sedentary work.  More specifically, she argues that the ALJ erred by failing to give appropriate weight to certain of Dr. Hosain's opinions, in particular, those contained on the forms he filled out on December 4, 2013 and September 10, 2014.  According to the plaintiff, the ALJ substituted his own opinion for that of a medical source, selectively evaluated the evidence before him, and misstated the record.  She further argues that the ALJ's questioning of the VE was based upon the wrong hypothetical, and therefore that his conclusion that there are jobs available for plaintiff is unsupported by substantial evidence.   In contrast, defendant argues that the ALJ's decision is legally correct and supported by substantial evidence.  For the reasons discussed below, the Court agrees with the defendant.

A.    The ALJ's Decision

The ALJ evaluated plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that plaintiff was not disabled within the meaning of the Act between June 12, 2007 and March 31, 2012, her date last insured.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 12, 2007, the alleged onset date, through March 31, 2012, her date last insured.  (Tr. 30.)  At step two, he determined that plaintiff had severe impairments consisting of degenerative joint disease of the

knee, degenerative joint/disc disease of the lumbosacral spine, and obesity.  (Tr. 30.)
The ALJ determined at step three that none of plaintiff's impairments, nor any
combination of those impairments, was of a severity to meet or medically equal one
of the listed impairments in Appendix 1 of the regulations.[8]  (Tr. 30-31.)

Before proceeding to step four, the ALJ determined that plaintiff had the
residual functional capacity ("RFC") to perform "sedentary work" as defined in the
regulations.[9]  (Tr. 31.)  He specified that he found that plaintiff could occasionally
lift and carry 10 pounds, stand and walk for two hours and sit for six hours per
eight-hour day.  (Tr. 31.)  He further concluded that additional limitations should
apply.  (Tr. 31.)  Specifically, he concluded that plaintiff must be afforded the
opportunity to change positions for two minutes out of every 20, could occasionally
balance and stoop, and could not work at unprotected heights, kneel, crouch, crawl,
or climb ropes, ladders, scaffolds, stairs, or ramps.  (Tr. 31.)  In making this finding,
the ALJ considered plaintiff's symptoms, objective medical evidence, and other
evidence, as well as opinion evidence.  (Tr. 31.)  The ALJ concluded that plaintiff's
"medically determinable impairments could reasonably be expected to cause the
alleged symptoms" but further concluded that plaintiff's statements concerning the
"intensity, persistence and limiting effects of these symptoms are not entirely
credible . . . ."  (Tr. 31-32.)

---

[8] The ALJ noted that he considered and rejected Listings 1.04 and 1.02.  (Tr. 30-31.)
[9] 20 CFR 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

The ALJ further explained the weight he accorded various medical opinions. He noted that he was giving "great weight" to the opinions of Drs. Foster, Goran, and Mann, the three independent physicians who examined plaintiff during or just following her insured period. (Tr. 35.) He gave "no weight" to Dr. Hosain's December 2013 and 2014 opinions, "no weight" to Dr. McLaughlin's August 2010 opinion, and "no weight" to Dr. Figueroa's 2015 consultative opinion. (Tr. 34-35.)

Based on plaintiff's RFC, the ALJ concluded at step four that plaintiff had been unable to perform her past relevant work. (Tr. 35.)

At the fifth and final step, based on his review of the entire record, including the testimony of a vocational expert, the ALJ determined that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed," such as document preparer, addresser, and order clerk. (Tr. 35-36.) He thus found that she was not disabled under the Act and denied her claim. (Tr. 36-37.)

### 1.   Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ erred as a matter of law in determining her RFC. She sets forth two arguments. First, she argues that the ALJ did not provide good reasons for giving no weight to Dr. Hosain's December 2013 and 2014 opinions. (Pl.'s Mem. in Supp. at 17-18.) Secondly, she asserts that the ALJ improperly substituted his judgment for that of a medical source. The Court finds both of these arguments unavailing.

First, plaintiff argues that the ALJ erred by giving no weight to Dr. Hosain's opinion. (Pl.'s Mem. in Supp. at 17.) She argues that as the treating physician, Dr.

Hosain's opinions should be given significant, if not controlling, weight. (Pl.'s Mem. in Supp. at 19.)

A treating source's opinion as to the ultimate conclusion of whether a claimant is disabled "cannot itself be determinative." Snell, 177 F.3d at 133. Indeed, "[t]he opinion of a treating physician is not binding if it is contradicted by substantial evidence." Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). However, in his consideration of the record, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33. As discussed below, the ALJ found that certain of Dr. Hosain's opinions were contradicted by substantial evidence; in addition, he comprehensively explained the weight given to each opinion.

The ALJ examined records from Dr. Hosain dating from 2009 through 2015. He noted that plaintiff was treated for chronic back pain with injections and medications, and had been diagnosed with lumbar and cervical facet disease and lumbar spondylosis. (Tr. 32.)

The ALJ then proceeded to weigh the other medical opinions, specifically those of the three independent doctors. He considered Dr. Foster's medical examinations in 2007 and 2008, Dr. Goran's in 2009, Dr. Mann's in August and September of 2012, and Dr. Figueroa's in 2015. (Tr. 33.) In his decision, the ALJ gave "great weight" to three of the four independent examiners, finding both that

they were consistent with each other and that they were supported by clinical findings.[10]  (Tr. 35.)

Specifically, he relied in part upon Dr. Foster's 2007 and 2008 opinions that plaintiff was able to perform sedentary/light work that would allow sitting and standing as needed, and would not involve lifting, bending, or carrying.  (Tr. 33.) He noted also that Dr. Foster observed that plaintiff exhibited signs of possible symptom magnification.  (Id.)

The ALJ further relied upon Dr. Goran's 2009 report and opinion, which reported both positive findings—antalgic gait and reduced range of motion of the spine—but also intact sensation and motor strength.  (Tr. 33.)  In addition, the ALJ noted that Dr. Goran found plaintiff to be capable of performing light work.  (Id.)

The ALJ also relied on Dr. Mann's 2012 report and opinion.  (Id.)  He noted that in Dr. Mann's opinion, the plaintiff could lift up to 30 pounds, but should avoid prolonged standing, walking, kneeling, and squatting.  (Id.)  He further noted that Dr. Mann recommended no further care.  (Id.)

After having reviewed all of the evidence, he stated that he would give no weight to Dr. Hosain's December 2013 opinion, both because it contradicted medical evidence in the record and also because it reported plaintiff's limitations as dating from 2007, despite the fact that Dr. Hosain only began treating plaintiff in 2009. (Tr. 34.)  The ALJ also gave no weight to Dr. Hosain's 2014 opinions, since they

---

[10] The ALJ gave no weight to Dr. Figueroa's 2015 examination, stating both that it was rendered too long after the last-insured date, and also that it was internally inconsistent with plaintiff's self-report of activities she routinely performed.  (Tr. 35.)

were distant in time from the plaintiff's last-insured date and because there was "no evidence prior to that to support [such] marked limitations." (Tr. 34.)

Plaintiff adds that it was error to refuse to credit Dr. Hosain's December 2013 opinion in its entirety based upon the fact that it was retrospective to two years before plaintiff began treatment. A retrospective opinion must be evaluated in terms of: 1) whether it is predicated upon a "medically acceptable clinical diagnostic technique;" and 2) whether, considered in the light of the entire record, it establishes the existence of a physical impairment prior to the date that doctor began treating plaintiff. Dousewicz v. Harris, Sec'y of Health, Education, and Welfare, 646 F.2d 771, 772 (2d Cir. 1981). In this case, the ALJ found that Dr. Hosain's retrospective opinion was unsupported by the evidence—including the objective diagnostic tests and plaintiff's subjective claims. (Tr. 34-35). Thus, the Court finds no error in the ALJ's statement that he rejected the opinion both because it was retroactive and because it was contradicted by substantial evidence.

Plaintiff's second argument is that the ALJ erred by substituting his own opinion for that of a medical source. (Pl.'s Mem. of Supp. at 16.) More specifically, plaintiff argues that the ALJ erred in including in his RFC the requirement that plaintiff change positions every two minutes out of 20. (Id.) She asserts that this was an improper substitution of the ALJ's opinion for those of doctors who opined that plaintiff needed to sit and stand at will. (Id.) The Court disagrees.

The Commissioner is authorized to resolve conflicts between conflicting medical opinions. Veino, 312 F.3d at 588. Furthermore, there is no requirement

that the ALJ's determination must mirror the medical opinions cited in his decision. "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." Matta v. Astrue, 508 Fed App'x 53 (2d Cir. 2013). Plaintiff argues that "nothing in the record" allows the ALJ to turn Dr. Foster's opinion that plaintiff should be able to sit or stand at will into the requirement that plaintiff be able to change position two minutes out of every 20. (Pl.'s Mem. of Supp. 16.) On the contrary, the ALJ explained in detail how he weighed the varying opinions of the medical professionals in reaching this determination. (Tr. 31-35.) As such, the Court finds plaintiff's argument lacking.

### 2. Misrepresentation of the Evidence

Plaintiff further asserts that the ALJ erred both by misstating the evidence, and by selectively evaluating the evidence before him. (Pl.'s Mem. in Supp. 19-21.) Specifically, she argues that any medical improvements were short-lived, that the ALJ inaccurately described her treatment as conservative, and that the ALJ misstated her activities of daily living. (Pl.'s Mem. in Supp. 20-21.) The Court disagrees.

The ALJ's statement that injections provided relief to the plaintiff's symptoms is accurate. He does not opine on the duration or completeness of the relief, but rather notes that treatment did provide relief. (Tr. 32.) While the plaintiff may indeed continue to suffer pain, a disability requires "pain so severe, by

itself or in conjunction with other impairments, as to preclude any substantial gainful employment." <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1552 (2d Cir. 1983).

The ALJ further notes that plaintiff was treated for her back pain with injections rather than surgeries. (Tr. 34.) The ALJ is entitled to consider conservative treatment history as additional evidence to support his disability determination where his decision does not rely exclusively on the treatment history to overcome an otherwise valid medical opinion. <u>Netter v. Astrue</u>, 272 Fed. App'x 54 (2d Cir. 2008). In this case, the treatment history was considered alongside the testimony of several physicians, including Dr. Mann, who found that follow-up care was entirely unnecessary. (Tr. 32-35.)

The Court acknowledges that in her hearing, plaintiff testified to severe limitations on her daily activities. (Tr. 54-60.) However, the ALJ weighed the credibility of this testimony alongside plaintiff's statements in other contexts that she faced significantly fewer limitations and found it lacking. (Tr. 33.) It is well within the ALJ's discretion to compare contradictory statements of daily activities. <u>See</u> SSR 16-3p ("The adjudicator must compare statements made by the individual in connection to his or her claim for disability benefits with statements . . . she made under other circumstances.").

The plaintiff alleges that the ALJ is "selective" in his evaluation of the evidence. (Pl.'s Mem. of Supp. 20.) Specifically, she alleges that the ALJ's statement that progress reports show relief with injections is a mischaracterization of the record as a whole. (<u>Id.</u>) The Court is not convinced. That plaintiff was

relieved after the injections is well-supported by the record. (Tr. 535, 538, 539, 541.)

The Court therefore finds that the ALJ did not err by misrepresenting the evidence.

### 3. Vocational Testimony

Finally, plaintiff argues that the ALJ erred in his questioning of the vocational expert. In essence, plaintiff's argument is that the ALJ elicited vocational testimony that failed to relate with precision to plaintiff's physical impairments and also that the ALJ failed to use the VE's response to the most appropriate hypothetical question. (Pl.'s Mem. of Supp. 21-23.)

It was not necessary for the ALJ to include the response to a hypothetical containing limitations not supported by the record. McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). The ALJ instead posed a hypothetical question that mirrored his RFC, which, as discussed above, was supported by substantial evidence. (Tr. 60-63.) He was therefore correct to rely on the VE's opinion, which constituted substantial evidence sufficient to meet his burden in the fifth step of the sequential evaluation. McIntyre, 758 F.3d at 151-52.

In short, the Court finds that the ALJ's RFC determination was supported by substantial evidence and the ALJ applied the correct legal standards in concluding that plaintiff was not disabled. The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston, 904 F.2d at 126; DeChirico, 134 F.3d at 1182-83.

IV.     CONCLUSION

For the reasons discussed above, defendant's motion for judgment on the

pleadings is GRANTED and plaintiff's cross-motion for judgment on the pleadings

is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 11 and

13 and to terminate the action.

SO ORDERED.

Dated:        New York, New York
              September 28, 2017

_____
              KATHERINE B. FORREST
              United States District Judge